# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Charles E. Fultz, II., first being duly sworn, do hereby aver, depose, and state as follows

**Location to be searched:** This affidavit is submitted in support of an application for a warrant to search the following place:

> FOR THE ENTIRE REAL PROPERTY, IMPROVEMENTS, AND PREMISES KNOWN AS 501 EDGEWOOD STREET, N.E., APARTMENT #1, WASHINGTON, D.C. 20017. THE BUILDING AT THIS ADDRESS IS A THREE-LEVEL APARTMENT BUILDING, WHICH IS PART OF AN APARTMENT COMPLEX KNOWN AS "EDGEWOOD TERRACE." THE BUILDING WITH THE STREET ADDRESS OF 501 EDGEWOOD STREET, N.E., IS ON THE SOUTH SIDE OF EDGEWOOD STREET, N.E., AND BEARS THE NUMERALS "5" "0" "1" AT THE BUILDING'S ONLY MAIN, FRONT ENTRANCE. THE SPECIFIC APARTMENT IN THIS BUILDING IS ON THE FIRST FLOOR, DOWN THE STEPS FROM THE MAIN ENTRANCE, TO THE LEFT. THE APARTMENT DOOR BEARS THE NUMERAL "1" ON IT AND IS YELLOW.

(1) The Affiant is familiar with the specific location to be searched and will be present to ensure that, if a warrant issues, the correct place is searched. I either know the information set forth in this affidavit from what I have observed, or it has been told to me by other sworn law enforcement officers. In the rest of this affidavit, when first-person pronouns are used, they refer to me.

## I. SUMMARY

(2) In swearing to this affidavit, I respectfully submit that probable cause exists to believe that there are within this apartment number one at 501 Edgewood Street, N.E., papers, records, documents and other evidence of a series of felony violations of the Controlled Substance Act, specifically, of Title 21, United States Code, Sections 841(a)(1). This proscribes illegal possession and distribution of such controlled substances as crack cocaine base. Between April and November 2004, a confidential informant and special police employee (CI/SE) bought half ounce, ounce, one-sixteenth kilogram amounts of crack cocaine base eight times from defendant Allen Jerome Matthews in the District of Columbia. These sales took place at defendant Matthews work place in the 400 block of N Street, N.W. During this entire time and through this date, this apartment on Edgewood Street, N.E., has been defendant Matthews' residence. As recently as two weeks ago, I know that defendant Matthews made a phone call in which he offered to sell illegal drugs, using coded references to having a supply of suspected crack available. Indeed, in the months since November 2004, at least every couple of weeks, defendant Matthews has made phone calls indicating that he had illegal drugs, most likely crack cocaine base, available for sale. In April 2005, a federal grand jury in Washington, D.C., indicted defendant and charged him with a number of felony crimes involving sales of crack cocaine base in the District of Columbia. This case is pending in the U.S. District Court for the District of Columbia, and a U.S. Magistrate Judge has issued a warrant for defendant's arrest as a result of this indictment.

## II. AFFIANT'S RESUME

(3) I have been a sworn Officer of the Washington, D.C., Metropolitan Police Department (MPD) for nearly seven years and a police officer for more than a decade. During my career, I have been trained in standard police procedures and anti-drug-enforcement operations. I now work with MPD's Major Narcotics Branch, assigned to the narcotic strike force unit. To carry out my law enforcement duties, I am specially deputized as a sworn Special Federal Officer with the Federal Bureau of Investigation (FBI).

(4) Before joining the Major Narcotic Branch, among my police assignments, I worked for several years in an MPD tactical unit in the Fifth District. Much of that unit's work involved anti-street crime activities focusing on criminals who had drugs or guns. In the course of my police duties, I have taken part in arresting more than 1000 persons for violating local or Federal drug laws, along with numerous gun-related crimes. I also have taken part in executing at least 40 search warrants during which police found and seized narcotics, drug paraphernalia, money, and/or firearms. In the course of my police duties, I have interviewed scores of persons arrested in Washington, D.C., on drug charges concerning their unlawful activities. Further, I have spent many hours engaged in secret surveillance of persons involved in illegal narcotic activity. As a result of my training and experience, I have learned how narcotic-traffickers sell drugs and organize their activities.

### III. **DEFENDANT'S INVOLVEMENT IN ILLEGAL ACTIVITY**

(5) Since April 2004, I been involved in an investigation into the sale of crack cocaine base by a man known as Allen Jerome Matthews. In this course of this investigation, a special police employee has bought illegal drugs from Matthews a number of times. I recount below some of the main events that took place during this investigation. On April 12, 2005, a federal grand jury indicted defendant Matthews on charges that he had unlawfully distributed controlled substances by selling crack cocaine base to a confidential police informant and special employee, whom I refer to as "CI/SE" or just "CI." Each of these distributions was a "controlled buy" from defendant, in that it took place at the behest of police investigating defendant Matthews and was made under officers' supervision. In each instance, before the CI/SE made the purchase, an officer searched him and found that he had no illegal drugs or money. An officer then gave the CI/SE police funds, which it used to buy illegal drugs from defendant Matthews. After this "controlled buy," the CI/SE turned over to a police officer the crack cocaine it had bought from defendant Matthews, and police searched it again to see that it had no other illegal drugs or money it had not given to police. I have not recounted below all of the facts known to me through the investigation, but simply those necessary to set forth probable cause to search defendant's residence at apartment #1, 501 Edgewood Street, N.E., Washington, D.C.

(6) On April 16, 2004, the CI telephoned defendant, who has been identified as Allen Jerome Mathews of 501 Edgewood Street Apartment #1, Washington, D.C., 20017. During the conversation, Mathews agreed to sell about a quarter ounce of crack cocaine for $300. Mathews told the CI to meet him at defendant's place of business, referring to 405 N Street, N.W, Washington, D.C. Later that day, at about 12:00 noon, the CI met Mathews in front of this address. Defendant Mathews and the CI walked inside the building and gave Mathews police funds in return for a clear ziplock bag containing an off-white colour, rock-like substance that appeared to be crack cocaine base. A chemist working at the U.S. Drug Enforcement Administration's (DEA) Mid-Atlantic Laboratory performed a scientific

analysis of this substance, which was found to be cocaine base weighing 5.7 grams. Police officers who saw these drugs indicate that the cocaine base was of the type known on the street as crack cocaine. Evidence of this event led the grand jury to charge defendant with the crime of unlawful distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1), in the indictment returned in April 2005 and referred to earlier in this affidavit.

(7) On April 21, 2004, defendant Mathews returned a page to the CI to confirm plans to sell $350 of crack cocaine. The CI again met Mathews at 405 N Street, N.W., where an under cover police officer followed the CI into this address and watched the CI meeting Matthews. The CI gave Mathews $350 in exchange for a clear baggie containing suspected crack cocaine, which a DEA analysis later found to be 5.9 grams of cocaine base. As was to be the case in many of the later sales involving defendant Matthews, officers supervising the CI made a video recording of him, and he was equipped with a transmitter device to broadcast his conversation with defendant. Evidence of this sale led the grand jury to charge defendant with the crime of unlawful distribution of cocaine base in the indictment returned in April 2005.

(8) On May 7, 2004, The CI paged defendant Mathews. Mathews returned the page to the CI, who asked if they could met, and Mathews agreed. The CI went to 405 N Street, N.W., and contacted defendant Mathews while he was on his lunch break. The CI and Mathews then went inside. Mathews and the CI exchanged two clear zip locks of suspected crack cocaine for $550. A DEA analysis found the suspected crack to be 11.3 grams of cocaine base. Evidence of this sale led the grand jury to charge defendant with the crime of unlawful distribution of cocaine base in the indictment returned in April 2005.

(9) On May 13, 2004, the CI spoke to defendant Mathews, who said to meet at the corner in the 1100 block of 6th Street, N.W., Washington, D.C. The CI was driven to the location where the CI was observed meting Mathews and then going into 1136 6th Street NW. Once inside, Mathews handed the CI four clear sandwich baggies containing suspected crack cocaine and got back $1200. The CI left and met with an under cover police officer who had been waiting for the CI. The CI gave the under cover officer the suspected crack cocaine, which a DEA analysis found to be cocaine base weighing 23.2 grams. Evidence of this sale led the grand jury to charge defendant with the crime of unlawful distribution of cocaine base in the indictment returned in April 2005.

(10) On June 23, 2004, the CI made arrangements to met defendant Mathews at 405 N Street, NW. Once there, the CI met Mathews and they exchanged $1200 for a clear baggie with four clear ziplock bags each with suspected crack in it. Just after the sale, an under cover officer saw Mathews inside 405 N Street, N.W. A DEA analysis found the suspected crack cocaine to be 22.9 grams of cocaine base. Evidence of this sale led the grand jury to charge defendant with the crime of unlawful distribution of cocaine base in the indictment returned in April 2005.

(11) On September 24, 2004, the CI telephoned defendant about buying crack cocaine. During this conversation, Mathews told the CI that he only had a couple of "quarters" left and to call back later that afternoon. Ultimately, the CI went to 405 N Street, N.W., and met Mathews, who sold eight clear ziplock bags of suspected crack for $2000. The suspected crack that Matthews sold was analysed as 50.2 grams of cocaine base.

Evidence of this sale led the grand jury to charge defendant with the crime of unlawful distribution of cocaine base in the indictment returned in April 2005.

(12) On October 7, 2004, defendant sold the CI about 50 grams of crack cocaine in exchange for $2300 in police funds, and this buy took place under police supervision. It occurred at defendant's place of employment, 405 N Street, N.W., as had the earlier controlled purchases. As had been the case with a number of the previous controlled buys from defendant, officers supervising the CI made a video recording of him, and he was equipped with a transmitter device to broadcast his conversation with defendant. The sale took place at 405 N Street, N.W., Washington, D.C. A DEA analysis found that the crack cocaine was cocaine base and weighed 50.0 grams. Evidence of this sale led the grand jury to charge defendant with unlawful distribution of cocaine base in the indictment returned in April 2005.

(13) On November 11, 2004, defendant sold the CI more than 50 grams of crack cocaine in exchange for $2600 in police funds, and this buy took place under police supervision. Officers supervising the CI made a video recording of him, and he was equipped with a transmitter device to broadcast his conversation with defendant. The sale took place at 405 N Street, N.W., Washington, D.C. A DEA analysis found that the crack cocaine was cocaine base and weighed 55.3 grams. Evidence of this sale led the grand jury to charge defendant with unlawful distribution of cocaine base.

(14) In the period since November 2004, the CI/SE has received at five phone calls from defendant Matthews, in which defendant offered to sell the CI/SE illegal drugs, in keeping with their past buyer-seller relationship. Based on my knowledge of the CI/SE, this investigation, and other police investigations into narcotics trafficking, I believe that defendant Matthews might well have learned that other persons are supplying illegal drugs to the CI/SE, and that Matthews is trying to get back in business with a previous customer. According to what the CI/SE has told me, defendant Matthews has advised -- in code -- when he has drugs to sale, indicating that he "is back up" and willing to do business in selling drugs again.

### IV. **DEFENDANT'S RELATIONSHIP TO PLACE TO BE SEARCHED**

(12) As part of our investigation, a police officer spoke with defendant Matthews in August 2004, and defendant said that he lived at 501 Edgewood St, N.E. apartment number 1, Washington, D.C. In January of this year, I reviewed a lease that defendant had signed for this apartment. Additionally, throughout the course of this investigation, I have obtained information from computerized law enforcement records, including the Washington Area Law Enforcement System (WALES) and the National Crime Information Centre (NCIC). For example, I have checked the District of Columbia Department of Motor Vehicles, which indicates that it issued a driver's license to defendant Matthews most recently on September 14, 2004, and shows his address as 501 Edgewood Street, N.E., # 1. The print-out of motor vehicle records contains a picture of the holder which I recognize as defendant Matthews.

(13) On this date, June 7, 2005, I caused to be run a computer check of law enforcement records through the WALES and related systems. I found that defendant

-4-

Matthews has four vehicles registered in his name with the address of 501 Edgewood Street. N.E., Washington, D.C. 20017. The first is a 1998 Ford Expedition, tag number AY 2559, vin number 1FMPU18LXWLB83921. The second vehicle is a 2004 Honda Pilot, tag number CC 9487, vin number 2HKYF18684H610754. The third vehicle is a 1996 Honda Accord, tag number 707304, vin number 1HGCE6675TA021691. The fourth vehicle is a 1996 Honda, tag number AQ 9821, vin number JHMRA1865TC018630.

(14) Additionally, I have reviewed copies of correspondence between defendant and the SunTrust Bank, concerning a chequing account in defendant's name. This correspondence was addressed to: 501 Edgewood Street, Northeast, Washington D.C. 20017: "ALLEN MATTHEWS 501 EDGEWOOD ST NE APT 1 WASHINGTON DC 20017-3308" One such letter was dated in July 2004. In January 2005, I had an investigative check performed of records maintained by credit bureaux, and a "Basic Report" through ChoicePoint stated that defendant resided at "501 Edgewood St 1 Washington, DC 20017," giving defendant's date of birth of April 1946 and a social security number of 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. This information indicated defendant had lived at this address on Edgewood Street, N.E., Washington, D.C., for several years back to 2001.

## V. NEXUS BETWEEN PLACE TO BE SEARCHED AND EVIDENCE

(14) Based on my training, experience and participation in narcotic and drug-related investigations and the training and experience of other Officers and Agents with whom I work closely, I know that:

> A. Most drug sellers use their homes as the main place to keep items associated with their business, including drugs they are waiting to sell, records of their business, and money they have made. Although drug sellers are engaged in an unlawful trade, they nevertheless act similarly to small or mid-level retailers, except that they must hide their inventory, income, and associated papers and paraphernalia from competitors, police, and potential robbers. Drug sellers thus like to keep their drugs, money, and business records very close to hand and to hide these things in order to maintain the most effective control over them. Even when drug sellers have a secondary business place for actual sales, such as a stash or safe house, they still typically keep contraband, proceeds, and evidence in their homes.

> B. Like persons who engage in a lawful retail trade, illegal drug sellers make and keep papers that document their activities to keep track of their illegal business. These include records detailing the drugs they have ordered and those they have sold, as well as payments made and received, and money owed or owing. Such papers typically include accounting documents, receipts, notes, ledgers, bank records, and money orders. Drug sellers keep such papers or records close to hand for ready access such as in safe places in their homes.

> C. Drug sellers often hide in these same places at home the money or goods they get from selling drugs, so that in such places typically are found large amounts of cash or other valuable items, which are the proceeds of the unlawful business.

D. Persons who sell illegal drugs, particularly cocaine, commonly keep close to hand, particularly at home, things used to process, cut, or cook cocaine, such as such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, dishes and other containers for converting cocaine into cocaine base

E. Drug sellers typically keep close to hand, particularly at home, books or papers listing the names, addresses, and/or telephone numbers for their associates in the business. Drug sellers often use cell phones, pagers and telephone systems to contact their associates in the narcotic trade.

F. Drug sellers often take photographs of themselves, their associates, and their property and illegal contraband. They usually keep such photos at home.

G. Because the drug trade is illegal, cash-based, and highly profitable, drug sellers are at risk of being robbed or "muscled out" by competitors. Drug dealers associate with criminals, many of whom are prone to violence. Thus many, if not most, drug-dealers regularly carry or have close to hand guns and ammunition. They have these to protect themselves, their drugs, and their money.

## VI. CONCLUSION

(15) Based upon the facts set forth above, I respectfully request that this Court issue a warrant to search the premises at 501 Edgewood Street, N.E., Washington, D.C. 20017, for the items specified in attachment A, and to seize same if found.

FURTHER THAN THIS, Affiant sayeth not.

x _____
Officer Charles E. Fultz, II
Metropolitan Police Department
Major Narcotics Branch

JUN 15 2005

Sworn to and subscribed before me this _____ day of June 2005.

_____
United States Magistrate Judge

JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE

SCHEDULE A

(1) books, records, receipts, notes, ledgers, computers and magnetic storage devices, and other papers, documenting narcotics trafficking, or the identities of persons engaged in narcotics-trafficking;

(2) large sums of cash, or other valuable items such as jewelry or rare coins, representing the proceeds of illegal narcotics trafficking, plus financial documents, records, papers, ledgers, and accounting documents, which are evidence of financial transactions relating to narcotic trafficking and/or the obtaining, transferring, hiding or spending of large sums of money made from drug trafficking.

(3) rental records and real estate documents; indicia of occupancy, residence, and/or ownership of the premises described in the affidavit, but not limited to, utility and telephone bills, addressed envelopes delivered through the mail, and house keys;

(4) papers, tickets, notes, schedules, receipts, and other items relating to domestic travel, in connection with narcotics trafficking; and, in particular, documents, papers, receipts, and bills for the rental of automobiles used to transport drugs;

(5) photographs and video tapes, in particular, photographs of coconspirator and/or assets, cars, and other items of value that identify items representing the proceeds of narcotics trafficking; and,

(6) phone records, electronic beepers and pagers (and numbers contained therein), and cellular phones and records pertaining to their acquisition; and,

(7) safes or safe deposit boxes and their contents to include any narcotics, firearms, or other contraband, and any item set forth in this Schedule A.